UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FIRST EQUITY CORPORATION,
and COMPUSONICS VIDEO
CORPORATION,

       Plaintiffs,

v.                                Case No. 05-70341

TARGET HOLDING B.V., SENOL        HONORABLE AVERN COHN
HARFAR, GEORGE BURMANN,
and GUNNALLEN FINANCIAL, INC.

       Defendants.

_____/

**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO
DISMISS AND FOR SUMMARY JUDGMENT.**

**I. Introduction.**

This is a breach of contract case involving, <u>inter alia</u>, violations of federal

securities laws.  Now before the Court is a motion to dismiss filed by all defendants

under Fed. R. Civ. Proc. 12(b)(6).

The plaintiffs are:[1]

(1)    **First Equity Corporation** (First Equity), a Michigan corporation
located in Farmington Hills, Michigan; and

(2)    **Compusonics Video Corporation** (CPVD), a publicly held
Colorado corporation with offices in Farmington Hills, Michigan.

---

[1] Numerous parties were dismissed from this case after the Court granted, in part, a prior motion to dismiss.  Under the Order entered on July 1, 2005, the remaining plaintiffs were given thirty days to file an amended complaint.  <u>See</u> Transcript of June 30, 2005, hearing.  The motion before the Court follows the filing of the amended complaint.

The defendants are:

(1)     **Target Holding B.V.** (Target B) a Netherlands business entity;

(2)     **Senol Halfar** (Halfar), a Turkish citizen who currently lives in Germany and does business in Michigan and Florida.  Halfar formed Target B sometime in 2004;

(3)     **GunnAllen Financial, Inc.** (GunnAllen), an investment banking and stockbrokerage firm headquartered in Tampa, Florida.  It has a number of branches in Florida and also maintains a branch in Jackson, Michigan.[2]

(4)     **George Burmann** (Burmann), a German national who resides in Florida; Plaintiffs say that Burmann has had a U.S. "green card" since 1984; Burmann is a state and federally licensed securities broker; he works at a Florida branch of GunnAllen;

Relevant non-parties are:

(1)     **Enercorp, Inc.** (Enercorp), a publicly held Colorado corporation with its main offices located in Oakland County, Michigan; and,

(2)     **Target Holding B.V. i.o.** (Target A),[3] a partnership in the Netherlands, owned by non-parties Harald Engels and Maurice Sormani.

The alleged breach of contract arises out of one or more alleged agreements between plaintiffs and one or more of the defendants to sell the stock of CPVD.

Plaintiffs make the following claims in the amended complaint (Amended Complaint):

---

[2] The amended complaint alleges that GunnAllen maintains a branch office in Jackson, Michigan.  GunnAllen disputes this and says that the office closed before the cause of actions stated in the amended complaint arose.

[3] Target A is the predecessor of Target B, which assumed all of Target A's assets and legal obligations.  Plaintiffs say Target A was to become a corporation, but the formalities for its incorporation were never completed.

2

| Count | Claim | Defendant(s) |
|-------|-------|--------------|
| 1 | First Equity/Breach of Contract | Target B |
| 2 | CPVD/Breach of Contract | Target B |
| 3 | First Equity/Third Party Beneficiary Claim | Target B |
| 4 | First Equity/Breach of Fiduciary Duty | Burmann, and GunnAllen |
| 5 | Both Plaitinffs/Fraud and/or Constructive Fraud | Burmann, Halfar, GunnAllen, and Target B |
| 6 | Both Plaitinffs/Conspiracy to Defraud | Burmann, Halfar, GunnAllen, and Target B. |

The motion to dismiss is based on a variety of grounds, including:

(1)   lack of personal jurisdiction over GunnAllen and Burmann;

(2)   *res judicata*;

(3)   First Equity's lack of standing to assert a claim against Target B; and

(4)   failure to establish a fiduciary relationship.

For the reasons that follow, the motion is GRANTED in part and DENIED in part.

## II. Background[4]

### A. Allegations in the Amended Complaint.

#### 1. General.

CPVD entered into a Consulting Agreement (Consulting Agreement) with Target

A on October 23, 2002.  Halfar negotiated and drafted the Consulting Agreement on

---

[4] The background is gleaned from the parties' papers, primarily the Amended Complaint.

3

behalf of Target A.  The Consulting Agreement called for the sale of three "tranches" of CPVD stock for a total of 24 million shares.  A "tranche" is eight million shares of stock. The shares were not owned by CPVD, and only the second and third "tranches" are implicated here.

### Count 1.

On or about August 29, 2003, First Equity entered into an agreement with Target A under which it was to sell to Target A eight million shares of CPVD for $.02 per share for a total of $160,000.  This was the second "tranche."   First Equity transferred the shares to Target A's account at GunnAllen.  Target A only payed First Equity $125,000, leaving an unpaid balance of $35,000.  Target A agreed to buy another eight million shares of CPVD at the same time; this was the third "tranche."  Target A did not complete the sale of the third "tranche."  First Equity was damaged by Target A's failure to pay the $35,000 and the failure to purchase the shares in the third "tranche," for a total of $195,000.  Target B has assumed all of Target A's assets and legal obligations.

### Count 2.

Target A materially breached the Consulting Agreement by failing to purchase the shares referenced under Count 1, and by failing to exercise certain warrants. Additionally, the proceeds of the "tranches" were to be invested in CPVD to fund its efforts to market and sell its business software.  CPVD requests special or consequential damages for Target A's breaches.  Target B has assumed all of Target A's assets and legal obligations.

### Count 3.

4

It was understood by CPVD, Target A, Halfar, Burmann, and GunnAllen that First Equity was a third party that would be tendering sixteen million of its shares in CPVD to Target A under the Consulting Agreement.  Burmann and GunnAllen had a conflict of interest since they were representing First Equity and Target A with respect to the sale of First Equity's CPVD stock to Target A, and they acted as broker and agent to both in completing the sale of the second and third "tranches" of eight million shares each. Target A breached the Consulting Agreement by failing to complete the sale of the "tranches" and not making full payment for the second "tranche," resulting in damages to First Equity.  Target B has assumed all of Target A's assets and legal obligations.

### Count 4.

Burmann and GunnAllen were acting as stockbrokers and agents for First Equity, the seller, and Target A, the purchaser, with respect to the CPVD stock transactions. As such, Burmann and GunnAllen were fiduciaries of First Equity.  However, Burmann and GunnAllen also were acting as fiduciaries of Target A.  By representing parties on both sides of the transaction, Burmann and GunnAllen breached their fiduciary duties by knowingly making representations in which they had a serious conflict of interest. Burmann and GunnAllen allowed Target A to fail to pay in full for the second "tranche," and to not purchase the third "tranche," allowed Target A to switch its account over to Target B, and allowed Target B to give the profits from the sale of the second "tranche" to Burmann and Halfar to be used for their personal purposes.

### Count 5.

The purpose of selling the stock of CPVD to Target A at $.02 per share was so

that these shares of stock could become, in effect, a Private Investment in a Public

Entity (PIPE), be promoted and sold by Halfar, Burmann, and GunnAllen for higher

prices in the market, thus making a profit for Target A and raising capital for CPVD.

Burmann, GunnAllen and Halfar represented to First Equity that it would get its money.

Instead, Halfar, Burmann and GunnAllen fraudulently misled and/or constructively

defrauded First Equity by preventing it from getting its money and being involved in the

transfer of shares from Target A to Target B.

### Count 6.

Burmann and Halfar wrongfully transferred Target A's account to Target B

through a conspiracy involving Halfar, Burmann, and GunnAllen, without informing First

Equity, CPVD, or Target A's owners Engels and Sormani.  Without their knowledge,

Halfar formed Target B in 2002 and became its president.  Defendants took control of

the CPVD shares, sold them on the market, deposited the profits into the account of

Target B, and failed to fully compensate First Equity for the shares.  In addition, after

depositing the proceeds of the sale of shares into Target B, the Defendants used the

money to finance litigation on behalf of Burmann to attempt to take control of Enercorp,

which owned ten million shares of CPVD.

### B.  Additional Background.[5]

Burmann is a stockbroker currently working as an independent contractor in

GunnAllen's Orlando, Florida office.  In 1997, Enercorp approached Burmann about

investing in CPVD.  Enercorp is a publicly held corporation that acts as a business

---

[5] These facts are not alleged in the Amended Complaint.  They are helpful to an understanding of the issues raised in the motions.

6

developer for many companies, including CPVD.  Between October, 1997, and July, 2003, Burmann purchased an approximate 6.5% stake in Enercorp, and also referred investors to the company, including Target A.

From 1999 onward, Enercorp and CPVD performed poorly.  Due to Burmann's interest in Enercorp and the fact that he had referred other investors to Enercorp, Burmann became concerned in mid 2003 that Enercorp had not held a shareholder meeting since January, 1999.  Burmann's attempt to change Enercorp's management and a resulting proxy fight led to a lawsuit in February, 2004, in the Federal District Court in Denver, against Enercorp (Colorado Action).  The district court granted Burmann's summary judgment motion, and his request for attorney fees.  The district court retained jurisdiction to monitor the upcoming shareholder meeting.    According to Plaintiffs, Burmann and Halfar attended the shareholders' meeting and tried to take control of Enercorp by publishing and distributing false proxy information.

Burmann says Enercorp raised as defenses during the Colorado Action many of the issues affirmatively alleged by First Equity and CPVD in this case and that the district court rejected Enercorp's arguments.

### III. Discussion

### A. Legal Standard

A Fed. R. Civ. P. 12(b)(6) motion seeks dismissal for a plaintiff's failure to state a claim upon which relief can be granted.  "The court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that

7

would entitle it to relief." <u>Bovee v. Coopers & Lybrand C.P.A.</u>, 272 F.3d 356, 360 (6th Cir. 2001). "To survive a motion to dismiss under Rule 12(b)(6), a 'complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" <u>Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n.</u>, 176 F.3d 315, 319 (6th Cir. 1999) (quoting <u>Scheid v. Fanny Farmer Candy Shops, Inc.</u>, 859 F.2d 434, 436 (6th Cir. 1988)).

## B. Analysis.

### 1. Whether the Court has Jurisdiction over GunnAllen and Burmann.

GunnAllen and Burmann say that even if all facts pled in the Amended Complaint are true, there is no basis upon which the Court can assert personal jurisdiction over them, and therefore they must be dismissed from the case.

### a. Jurisdiction over GunnAllen.

Jurisdiction over GunnAllen is based on two facts. First, the Plaintiffs say GunnAllen consented to jurisdiction in Michigan by filing an Application for Certificate of Authority to Transact Business or Conduct Affairs in Michigan (Application). The Application was dated June 8, 2005, and was filed on July 20, 2005. The Court held a hearing on the case on June 30, 2005.

Second, the Plaintiffs say GunnAllen maintained "continuous and systematic" contact with Michigan by maintaining offices within the state, and by being currently registered to do business with the state. GunnAllen also advertises on its website that it currently maintains two active offices in Michigan, in Waterford and Plymouth. GunnAllen also formerly had an office in Jackson, which it presented to the public on its

8

website at the time the case was initially filed.  The Plaintiffs argue general jurisdiction under M.C.L. § 600.711 does not require any showing that the damages claimed were related to the Burmann and GunnAllen's transactions in Michigan.

GunnAllen responds that its contacts with Michigan must have existed at the time the cause of action arose.  General Motors Corp. v. Arriortua, 948 F. Supp. 656, 663 (E.D. Mich. 1996).  Acts occurring subsequent to the events underlying the case are irrelevant.  GunnAllen says some of the acts alleged by the Plaintiffs to support jurisdiction occurred not only after the dispute arose, but also after the filing of the complaint.  GunnAllen says the claims must have arisen at least by the time the Colorado Action was filed in February, 2004, thus jurisdiction is improper.

Additionally, GunnAllen says nothing in the complaint's factual allegations have any connection with Michigan, with the possible exception that First Equity owned some of the CPVD shares that were deposited into the GunnAllen account in Florida.  This slight connection is insufficient to support personal jurisdiction.  GunnAllen says neither the Michigan long-arm statute or the Fourteenth Amendment "minimum contacts" requirements are met.  GunnAllen says the Sixth Circuit's three-part minimum contacts test requires an inquiry into whether: the defendant purposely availed himself of the privilege of acting in the forum state; the cause of action arose from the defendant's activities there; and, the acts or their consequences had a substantial enough connection with the forum state to make the exercise of jurisdiction reasonable. Southern Mach. Co. v. Mohasco Indus., Inc., 401 F.2d 374 (6th Cir. 1968).  GunnAllen is a Florida corporation, based in Florida, and, though it at one time had a Michigan office,

the Plaintiff's claims did not arise out of the presence of this office in any way. Accordingly, GunnAllen says jurisdiction is improper.

### b. Jurisdiction over Burmann.

The Plaintiffs assert jurisdiction over Burmann because he was present in Michigan "at the time when process [was] served." M.C.L. § 600.701(1). Burmann agrees that he was properly served in Michigan. The Plaintiffs also say the Burmann, through counsel, consented to jurisdiction over him at the June 30, 2005, hearing.

Burmann responds that the Plaintiffs fail to allege even a de minimis connection between Burmann and Michigan. Prior to the initiation of the case, Burmann had been to Michigan only four times in his life, and each time was to conduct due diligence on publicly traded companies unrelated to this case.[6] Burmann says he never solicited business, nor negotiated or entered into any contracts while in Michgan. Such minimum contacts cannot support personal jurisdiction. Moreover, Burmann notes that none of the trips to Michigan involved the Consulting Agreement upon which the Plaintiffs base their claims. Burmann is not a party to the Consulting Agreement, and it is unfair to force him to litigate in this forum where he has hardly visited, and where the underlying events are unrelated to his visits to Michigan.

Though Burmann was served in Michigan, thus satisfying the Michigan long-arm statute, the second part of the personal jurisdiction inquiry is whether an assertion of jurisdiction satisfies the Fourteenth Amendment due process clause. Burmann says

---

[6] Burmann says he only came to Michigan at the request of a Mr. Itin. Though this fact is presented as unrelated to First Equity's action, it is unknown whether Mr. Itin is affiliated at all with First Equity or CPVD.

10

Michigan's long-arm statute is not co-extensive with the due process clause.  Medler v. Elec. Co. v. Niland Co., 2005 WL 1983800, at *3 (E.D. Mich. 2005).  As such, Burmann argues that exercising personal jurisdiction over him does not meet the due process test, as his contacts are too attenuated.

As to his alleged consent to jurisdiction, Burmann says under M.C.L. § 600.745 such consent must be in writing.  There is no writing here, as the alleged consent occurred during the June 30, 2005, hearing, and therefore cannot be the basis for consent to personal jurisdiction.

### c.  Resolution.

Burmann and GunnAllen acted as agents and brokers for transactions involving a Michigan corporation (First Equity), and a Colorado corporation with offices in Michigan (CPVD).  GunnAllen has had, though not continuously, offices in Michigan.  Burmann has conducted business in Michigan and was served while in Michigan.  Though their contacts with the forum state are not extensive, the facts described constitute such minimum contacts as are necessary to satisfy the constitutional requirements of personal jurisdiction, as their actions did sufficiently put them on notice that they could be sued in Michigan.

### 2.  Whether First Equity has Standing to Sue as Alleged in Count 1.

### a.  Argument.

Target B, successor in interest to Target A, argues that First Equity lacks standing to sue under the Consulting Agreement.  First Equity says it entered into an agreement with Target A for the sale of CPVD shares of stock, and that Target A failed

11

to pay for the shares in full.  However, Target B says Target A contracted with CPVD, not First Equity, and one who is not a party to an agreement cannot pursue a claim for breach of that agreement.  Schafer Oil Co. v. Universal Underwriters Ins. Co., 820 F. Supp. 321, 324 (E.D. Mich. 1993).  Target B says First Equity can only sue as a third party beneficiary, which it does in Count 3.

First Equity responds that Target B misinterprets its basis for relief.  First Equity says it is not suing in Count 1 on the Consulting Agreement, but rather a contract involving related transactions for the sale of First Equity's shares in CPVD to Target A, through Burmann and GunnAllen.  First Equity says Target A failed to fully pay for the first eight million shares it transferred to Burmann and GunnAllen, and did not pay anything for the second eight million shares it was to transfer under an agreement.  As a party to this agreement, separate from the Consulting Agreement, First Equity says it has standing, had pled a breach of the agreement, and suffered a loss.

Target B's reply that the allegations in the Amended Complaint reference stock sales under the Consulting Agreement, and that First Equity admits it was not a party to the Consulting Agreement.  A breach of contract claims requires the "existence of a contract between parties."  Burton v. William Beaumont Hosp., 373 F. Supp. 2d 707, 718 (E.D. Mich. 2005).  If the Consulting Agreement is not the contract that was breached, Target B says it is unclear what was.

**b.  Resolution.**

It appears as though First Equity is suing on a separate agreement between it and Target A, not the Consulting Agreement.  Even though no written evidence of such

12

an agreement is proffered by First Equity, Target A did pay First Equity $125,000, allegedly as partial payment for one "tranche" of eight million shares of CPVD.  First Equity seems to argue that a contract existed, possibly an oral or implied contract, independently of the Consulting Agreement, as would be required since First Equity was not a party to the Consulting Agreement.  It is alleged, though not obvious, that a similar provision existed in the alleged contract for the sale of a second "tranche" of CPVD stock by First Equity to Target A.  Though Target A did not make a payment on this "tranche," that does not mean an agreement did not exist independent of the Consulting Agreement.  First Equity cites the Consulting Agreement as the source for the two "tranches," possibly leading to Target B's confusion, but asserts that a separate agreement between it and Target A led to the sale of the shares of stock between the parties.  Therefore, on the face of the Amended Complaint at this stage of the case, Target B's motion to dismiss must be denied.  However, during discovery First Equity must produce some additional evidence of a contract.

### 3.  Whether First Equity has Standing to Sue as a Third Party Beneficiary under Count 3.

### a.  Argument.

Target B says First Equity was not a third party beneficiary to the Consulting Agreement under Michigan law because no promise was made for a third party's benefit.  "A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise had undertaken to give or to do or refrain from doing something directly to or for said person."  M.C.L. § 600.1405.  Incidentally benefitting from a contract does not bestow third party beneficiary status, rather, it

requires an express promise to act for the benefit of the third party.  Riley v. Ameritech Corp., Inc., 147 F. Supp. 2d 762, 774 (E.D. Mich. 2001).

Target B says that the Consulting Agreement makes no reference to First Equity or any other parties that might benefit from it.  First Equity says it was "understood" that First Equity would be tendering some of the CPVD shares involved in the Consulting Agreement.  Target B says this purported and subjective intent of the parties is insufficient to support a third party beneficiary claim.  Target B also argues that First Equity cannot be a third party beneficiary simply because it was a CPVD shareholder.  To make a shareholder a beneficiary, the contract must express the intent of the promissor to benefit the shareholder personally, independently of his or her status as a shareholder.  Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001).  The Consulting Agreement references Target A's attempt to acquire shares from shareholders, which Target B says does not demonstrate any express intent to benefit First Equity independently of its shareholder status.

First Equity responds that third party beneficiaries include intended beneficiaries of contracts.  Schmalfeldt v. North Pointe Ins. Co., 469 Mich. 422 (2003)(internal citations omitted).    First Equity says it was an intended beneficiary under the Consulting Agreement.  The allegations in its complaint that First Equity's CPVD stock would be sold under the Consulting Agreement were sworn to by Engels.  Engels was a part-owner of Target A, a contracting party.  First Equity says it was intended by the parties that First Equity would sell sixteen million shares of CPVD stock to Target A under the second and third "tranches."

14

In its reply, Target B says that a contracting party's "motives and subjective intentions are irrelevant in determining whether, under M.C.L. § 600.1405, a third party is a beneficiary of a contract." <u>Taggart v. United States</u>, 880 F.2d 867, 869 (6th Cir. 1989). Target B says that the contract itself is the sole basis for determining third party beneficiary status in Michigan. <u>Ridgway v. Ford Dealer Computer Serv., Inc.</u>, 114 F.3d 94, 96 (6th Cir. 1997). The Consulting Agreement does not mention First Equity at all, and only references an attempt to acquire stock from shareholders generally.

### b. Resolution.

First Equity says it was an intended beneficiary of the Consulting Agreement. Yet its only support for this contention is the Consulting Agreement's reference to the purchase of stock from existing shareholders, and Engels' sworn statement that First Equity was the intended seller of the CPVD stock. On the face of the Consulting Agreement, no conclusion can be drawn even remotely that First Equity was an intended beneficiary of the contract. Therefore, Target B's motion should be granted as to Count 3.

### 4. Whether Res Judicata Bars Plaintiffs' Claims for Breach of Fiduciary Duties, Fraud, and Conspiracy to Defraud (Count 5 & 6).

### a. Argument.

All Defendants say Counts 4, 5 and 6 are repackaged claims and arguments that were previously considered and rejected in the Colorado Action. Res judicata prevents such re-litigation and forum shopping. In the Colorado Action, Burmann sued Enercorp

to obtain corporate records and compel Enercorp to hold a shareholders meeting.[7]

Enercorp allegedly raised and litigated many defenses, including: GunnAllen's alleged

consultant relationship with CPVD, Burmann's alleged self-dealing in connection with

the GunnAllen/CPVD relationship, Burmann's alleged relationship with CPVD,

Burmann's supposed use of profits from the sale of CPVD stock to finance his litigation

of the Colorado Action, issues of alleged problems with Burmann's proxy materials, and

all other issues relating to the CPVD transactions raised in this case.  The court in the

Colorado Action found in Burmann's favor, and ordered Enercorp to reimburse him for

the costs and attorney fees he incurred in litigating the matter.

Res judicata precludes a second action when (a) the prior action was decided on

the merits; (b) both actions involve the same parties or their privies; and (c) the matter in

the second case was, or could have been, resolved in the first.  Adair v. State, 470

Mich. 105 (2004).  The Defendants say the Colorado Action was decided on the merits,

and addressed all the same issues raised in the Amended Complaint.  To the extent

there are new allegations, the Defendants say these claims could have been brought in

the Colorado Action, and therefore are similarly barred from re-litigation.  Finally, the

Defendants say that First Equity and CPVD are privies of Enercorp.  Enercorp allegedly

sought to protect the interests of First Equity and CPVD in the Colorado Action due to

their close relationship.  Thus, the Defendants say that the Plaintiffs are bound by the

---

[7] These and other facts related to the Colorado Action were not pled in the
Amended Complaint, and therefore are not properly before the Court in a motion to
dismiss.  However, the Court recites these facts for the limited purpose of
understanding the motion.  Res judicata is best raised by a motion for summary
judgment.

judgment in the Colorado Action, and cannot reassert Enercorp's defenses as affirmative claims in Michigan.

The Plaintiffs say the parties and the claims presented in the Amended Complaint are different, therefore res judicata does not apply.  According to the Plaintiffs, privity requires a party to be "so identified in interest with another party that the first litigant represents the same legal right that the later litigant is trying to assert." Baraga Co. v. State Tax Comm., 466 Mich. 264, 269-70 (2002).  Enercorp owns shares of CPVD stock, but not First Equity stock.  Enercorp is not a party to this case, and could not be as Enercorp was not a party nor a third party beneficiary to the Consulting Agreement upon which Counts 4-6 are based.  The Defendants provide no support for the proposition that Enercorp sought to protect First Equity and CPVD's interests.

The Plaintiffs also say the subject matter of the two actions are unrelated.  The Colorado Action involved only Burmann and Enercorp, and an attempt to hold a shareholders meeting.  The Plaintiffs say there was no discussion in the Colorado Action of claims arising out of the Consulting Agreement, breach of contract, fraudulent transfers, or any of the Plaintiffs' other claims against the Defendants.

The Defendants reply that there need not be identical parties for res judicata to apply, and that Enercorp is one of CPVD's largest shareholders, thus putting them in privity.  As to the subject matter of the two actions, the Defendants say that it is immaterial that the two actions are based on a different ground, or tried on different theories, as res judicata still applies to bar re-litigation of *claims*.  Davis v. McKinnon & Mooney, 266 F.2d 870, 872 (6th Cir. 1959).

17

### b. Resolution.

The Court is not satisfied that it has been shown that First Equity and CPVD are in privity with Enercorp in the Colorado Action, and the record is incomplete to decide the issue on a motion to dismiss. Though it appears that some of the issues raised in the Amended Complaint were raised by Enercorp, they were not raised by First Equity or CPVD, and Enercorp's only relationship to either party is its ownership of stock in CPVD. It is unclear from the parties' papers what the stock sales under the Consulting Agreement had to do with the Colorado Action to compel an Enercorp shareholders meeting. In this case, the Plaintiffs assert fraud in the business relationship. What Burmann allegedly did specifically with his improper profits does not seem relevant here. Because the parties are not in privity, res judicata as the record stands does not bar the Plaintiff's claims.

### 5. Whether First Equity lacks a Fiduciary Relationship Upon Which to Sue (Count 4).

### a. Argument.

A fiduciary duty cannot be breached if it does not exist. Burmann and GunnAllen say that whether a fiduciary duty exists is a question of law, therefore the Court can dismiss the claim on a motion to dismiss. Anchor v. O'Toole, 94 F.3d 1014, 1023 (6th Cir. 1996). Burmann and GunnAllen say a fiduciary duty between a broker and his client only arises where the account in question is a discretionary account. First of Michigan Corp. v. Swick, 89 F. Supp. 298, 301 (E.D. Mich. 1995). Burmann and GunnAllen say the Plaintiffs must come forward with evidence in support of a fiduciary relationship between the investor and the broker, Swick, 89 F. Supp. at 301, and that

18

First Equity has not done so.  First Equity does not allege that it had a discretionary account with Burmann or GunnAllen, or any other facts that would give rise to a fiduciary duty, and simply concludes that the broker/principal relationship gave rise to a fiduciary relationship.  Burmann and GunnAllen say First Equity's brokerage account was non-discretionary, thus no fiduciary duty existed.

First Equity responds that there has been no determination as to whether its account with Burmann was discretionary or not, and that a fiduciary relationship does exist when Burmann and GunnAllen acted not only as broker but also as a principal who usurped control of First Equity's account and funneled the proceeds from the sale of First Equity's CPVD stock into an unauthorized account.  First Equity considers there to be three types of accounts: (1) nondiscretionary, where the broker is bound to act in the customer's interest but where generally a fiduciary duty does not attach; (2) discretionary, where the broker is the fiduciary and does not require prior authorization for each transaction; and, (3) a hybrid-type, where the broker has usurped actual control over a technically non-discretionary account, wherein the broker owes his customer a fiduciary duty.  First Equity cites Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 461 F. Supp. 951, 952-54 (E.D. Mich. 1978), for this framework.  The Leib court considered whether many transactions occurred without the customer's prior approval.  First Equity says Burmann and GunnAllen did this by transferring funds to Target B without CPVD or First Equity's authorization, thus indicating a usurpation of control over the account. First Equity also says that the cases relied upon by Burmann and GunnAllen do not involve relevant facts of this case, such as: a transaction that was never completed

19

because the seller did not receive the money for the stock, a broker had a conflict of interest, and a broker did not pay the selling customer but instead appropriated the funds for personal use.

Burmann and GunnAllen say they did not usurp control over First Equity's account, but, even if they did, First Equity has not pled sufficient allegations to establish a fiduciary duty in this way. Burmann and GunnAllen note that First Equity cites only one factor for determining whether a broker has usurped control of an account, as the others do not support its case, and that the Leib court found that the defendant had not usurped control over the plaintiff's account because the plaintiff, like First Equity, had professional experience in managing financial affairs, understood the stock market, knew how to handle a securities account, and the relationship with the broker was strictly professional. Therefore, Burmann and GunnAllen say simply alleging an act of fraud by a broker cannot create a fiduciary relationship where none existed before. Because First Equity has failed to produce evidence of a pre-complaint basis for a fiduciary relationship, Burmann and GunnAllen say Count 4 must be dismissed.

### b. Resolution.

As Burmann and GunnAllen argue, alleging that a non-discretionary account was usurped to render it discretionary does not make it so. However, the allegations contained in the complaint are sufficient to raise a question as to the existence of a fiduciary relationship for the purposes of a motion to dismiss. Confining factual considerations to the complaint, the allegations are sufficient, if true, to sustain a finding that Burmann and GunnAllen took control of First Equity's account and diverted funds to

20

Target B without the Plaintiffs' knowledge or permission.  A question of fact exists as to whether Burmann and GunnAllen's actions rise to the degree necessary to overcome the general proposition that non-discretionary investment accounts do not give rise to a fiduciary relationship.  Though the extent of Burmann and GunnAllen's alleged usurpation is unclear and currently unproven, it is adequately alleged in the Amended Complaint to sustain Count 4.

### 6.  Whether Defendants are Entitled to Sanctions.

### a.  Argument.

The Defendants ask for sanctions under Fed. R. Civ. Proc. 11 and 28 U.S.C. § 1927 for the cost of responding to both the original and amended complaint, which they say have increased the costs of the litigation.  The Defendants say they have been forced to defend against numerous, groundless allegations in the Plaintiffs' original complaint.  A majority of the allegations and defendants were dismissed after the June 30, 2005, hearing.  The Defendants also request sanctions for defending against the Amended Complaint which, as mentioned above, the Defendants consider to include numerous groundless claims, some against parties over which they say the Court lacks jurisdiction.

The Plaintiffs respond by asking for sanctions due to the Defendants' attempt to avoid the Court's jurisdiction.  The Plaintiffs say it has been the Defendants who have increased the costs of the litigation by arguing that the Court lacks jurisdiction, and making motions to dismiss.

### b.  Resolution.

21

Sanctions are not appropriate at this time, as both parties appear to be spending considerable time with preliminary matters.  Also, the Defendants make no argument that Count 2 warrants dismissal, thus the case would go forward regardless of whether the Court dismissed any parties or other claims.

### C.  Conclusion.

For the reasons stated above, the motion to dismiss for lack of personal jurisdiction is DENIED, the motion to dismiss Count 1 is DENIED, the motion to dismiss Count 3 is GRANTED, the motion to dismiss Counts 4-6 on the basis of res judicata is DENIED, and the motion to dismiss Count 4 claiming lack of fiduciary relationship is DENIED.  The Defendants' motion and the Plaintiffs' corresponding request for sanctions is DENIED.[8]

SO ORDERED.


Dated:  January 13, 2006                    s/Avern Cohn
                                            AVERN COHN
                                            UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, January 13, 2006, by electronic and/or ordinary mail.

                                            s/Julie Owens
                                            Case Manager
                                            (313) 234-5160

---

[8] As far as the Court can divine, this case in essence involves a claim for $195,000 representing the balance due on the sale of the second tranche of CPVD stock and the failure to pay for the third tranche.  If more in the way of damages is being asserted by plaintiffs, the Court would appreciate being advised with the particularities of the amount and the justification for the claims.